**Kathleen Barker CLEMENT, individually and as Personal Representative of the Estate of Burton Robert Barker, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. 90–0064–B.**

United States District Court, D. Maine.

July 23, 1991.

Valerie Stanfill, Berman Simmons & Goldberg, Lewiston, Me., for plaintiff.

Paula Silsby, Asst. U.S. Atty., Portland, Me., for defendant.

GENE CARTER, Chief Judge.

## OPINION AND ORDER

This matter comes before the Court for factfinding and final resolution of claims by Plaintiff Kathleen Barker Clement under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, arising out of the medical care and treatment provided by Defendant United States of America to Plaintiff's deceased brother, Burton Barker. Plaintiff's claims were tried before the Court without a jury on March 13 and 14, 1991.

## I. FINDINGS OF FACT

Burton Barker was struck in the lower back by a log while working at a sawmill in 1977. He sustained ruptures of the third and fourth intervertebral discs. This crippling injury, combined with Barker's experiences in Vietnam, produced a series of physical and emotional traumas which ended with Burton Barker's suicide on July 2, 1988. Barker was thirty-nine years old.

### A. Barker's Personal Circumstances

Burton Barker married Patricia Clement in 1970. They produced three children: Brenda Lee, who was seventeen at the time of her father's death; Bobbie Lynn, who was sixteen; and Jamie Robert, who was eleven. The Barkers divorced in Connecticut in 1981. Custody of the children was given to Patricia. Several reconciliations and separations followed until 1985, when Patricia and the three children moved to Maine. Burton Barker maintained good relations with his children even after they moved to Maine. He had an especially close relationship with his young son, Jamie.

Burton Barker worked in his own sheet rock business in spite of his serious back injury. But from 1980 to 1984 Barker underwent a series of major operations to redress a variety of ailments, some of which were associated with his back injury.[1] He was eventually forced to stop working in 1986. Barker began to drink alcohol during this period, occasionally to

1. These operations included a left inguinal hernia operation in 1980, an umbilical herniorrha- phy in 1983, and a gastrectomy and vagotomy for peptic ulcer disease in 1984.

excess. In April 1987, Burton Barker succeeded in reconciling with Patricia Barker and moved to Maine to live with his former wife and children. The Barkers lived together as a family from April through November 1987.

After he moved to Maine, Patricia Barker and Jamie Barker observed Burton Barker drinking vodka almost continuously throughout each day they lived together. They estimated that he drank between a fifth and a quart of vodka every day. Barker claimed that the alcohol eased the pain in his back. Patricia Barker and Kathleen Barker Clement, his sister and a daily visitor at the Barker house, noticed, however, that Burton Barker's behavior had changed. He would not shower or change clothes for days at a time. On November 13, 1987, Patricia Barker asked him to leave their house. In Patricia Barker's view, Burton Barker had lost his self-esteem.

Burton Barker moved in with Kathleen Clement. His daily and persistent drinking and his emotional deterioration continued after the move. At some point in late 1987 or early 1988, Burton Barker attempted suicide after having been involved in a minor accident which damaged his new truck. Barker went to the basement of his sister's home, draped a United States flag over his body, and attempted to stab himself in the stomach. His sister and brother-in-law stopped him from taking his own life.

The foregoing emotional and physiological history, including Barker's alcohol dependence, was the background for the treatment provided by Defendant at the

Veterans Administration Hospital at Togus, Maine.

### B. Treatment by Dr. Watanabe

Barker first sought treatment in Maine for his back problem at Mid–Maine Medical Center where he presented on June 16, 1987 with muscle spasms. He obtained Tylenol,[2] Codeine, and Valium[3] to relieve his back pain. On August 6, 1987, Barker returned to Mid–Maine Medical Center again complaining of pain in his lower back. He was seen by Dr. Jose Ramirez.[4] In addition to prescribing Flexeril,[5] Dr. Ramirez recommended surgery to redress Barker's acute back problems.[6] Dr. Ramirez also referred Barker to the Veterans Administration Hospital at Togus, Maine (hereinafter Togus) for a second opinion on the need for back surgery.

Barker's first examination at Togus took place on October 23, 1987 and was carried out by a physician's assistant. Barker complained of constant back pain, an accelerating loss of strength in his arms and legs, and numbness in his right hand. The physician's assistant prescribed five-milligram-strength Valium tablets and Tylenol #3. Barker returned to Togus on December 3, 1987 and was examined by Dr. Wilson Watanabe, chief of Togus' Orthopedics Section. Based on his own examination, the x-rays taken by Dr. Ramirez, and the examinations by Ramirez and the physician's assistant, Dr. Watanabe found that Barker suffered from severe double scoliosis of the dorsal spine and severe lumbar lordosis.[7] At trial, Dr. Watanabe described

2. Tylenol #3 is the trade name for Acetaminophen, an antipyretic (fights fever) and pain-relieving drug. *Physicians' Desk Reference* at 1186–88 (41st ed. 1987) (hereinafter PDR). To achieve internal consistency and consistency with the record, this opinion will, whenever possible, refer to the trade names of the various drugs discussed while identifying generic names in footnotes.

3. The generic name for Valium is Diazepam, a drug used to relieve short-term anxiety disorders and to assist in the relief of muscle spasms. PDR at 1698–99.

4. Barker had also visited Togus in late June 1987; however, he refused to pay the deductible

required for veterans with incomes at his level. As a result, Barker left without receiving treatment.

5. Flexeril is the trade name for Cyclobenzaprine, which is used for the relief of muscle spasms. PDR at 1290.

6. Dr. Ramirez performed arthroscopic surgery on Barker's left knee in October 1987.

7. Dr. Watanabe produced x-rays at trial which substantiated his judgment that Barker's back injury caused a severe deformity. The x-rays indicate severe curvature of the spine in several directions.

Barker's condition as the worst back deformity he had seen in his time as an orthopedist. He advised Barker that back surgery offered no better than a fifty percent chance of success and, therefore, recommended against the surgery. Since Barker's earlier prescriptions had expired, Dr. Watanabe prescribed Indocin,[8] rather than renewing the prescription for Valium.

Barker returned for a follow-up examination with Dr. Watanabe on December 13, 1987 and repeated his complaints of pain and muscle spasms. At this point, Dr. Watanabe prescribed five-milligram doses of Valium, and an anti-inflammatory drug called Naprosyn.[9] Dr. Watanabe intended the Valium to relieve Barker's muscle spasms, but he also expected that Barker would use the Valium to induce sleep. Dr. Watanabe testified that he was concerned that Barker not obtain an excessive quantity of Valium out of fear that an addiction to the drug might result. Limiting the quantity of a prescribed drug available to a patient is one safeguard against the formation of a habit, according to Dr. Watanabe. However, Barker's new Valium prescription allowed for five refills for thirty pills each at thirty day intervals.[10] This was an increased quantity from the prescription given in October 1987, which provided only ninety pills with no refills.

Burton Barker returned to see Dr. Watanabe on April 19, 1988 complaining of muscle spasms so severe that they interfered with his walking. Barker reported that the Naprosyn was not helping his back. The Valium offered some relief, but not enough. Barker admitted to Dr. Watanabe that he was using "booze" to help ameliorate the muscle spasms. Dr. Watanabe was concerned about Barker's use of Valium in conjunction with alcohol, which

he testified was a clear abuse of the medication. Even though he did not know whether Barker was Valium dependent at the time of this examination, Dr. Watanabe decided not to prescribe any additional Valium. Instead, Dr. Watanabe prescribed Paraflex[11] and Darvon–N 100,[12] a pain reliever and a substitute for Valium. However, Dr. Watanabe did not discontinue the Valium prescription he had given Barker at the previous examination. The record indicates that Barker obtained his final refill of the Valium prescription on May 2, 1988, more than two weeks after informing Dr. Watanabe that he was abusing alcohol and after collecting his prescription for one-hundred-milligram Darvon–N 100 tablets. *See* Exhibit 6 at 3–4.

At some point between the April 19, 1988 examination and May 17, 1988, Kathleen Clement called Dr. Watanabe to report that Barker "was getting wild" from his abuse of alcohol. Kathleen Clement also told Dr. Watanabe . about Barker's suicide attempt during the phone call. Dr. Watanabe recommended that Kathleen Clement bring her brother to the Mental Health Clinic at Togus for an evaluation. But Dr. Watanabe failed to note this conversation in Barker's medical record. He also failed to reduce or alter Barker's intake of prescription drugs, and he did not undertake any follow-up with a mental health professional at Togus. Dr. Watanabe saw Barker again on May 3, 1988 and made only the following notes in the medical record: "Darvon doesn't help. Back on Tylenol # 3. Recall 5/10/88. Need x-ray dorsal lumbar spine lordosis. /s/ W. Watanabe." *See* Exhibits 1A & 1B at 306 (hereinafter Record).[13] Dr. Watanabe did not see Barker again until he was admitted to Togus.

---

**8.** Indocin is the trade name for Indomethacin, an anti-inflammatory drug with antipyretic and analgesic qualities. PDR at 1504.

**9.** Naprosyn is the trade name for Naproxen, an anti-inflammatory drug with antipyretic and analgesic qualities. PDR at 2004.

**10.** The record reflects that Burton Barker obtained the five permitted refills at approximately one month intervals. *See* Exhibit No. 6 at 3.

**11.** Paraflex is the trade name for Chlorzoxazone, a muscle relaxant. PDR at 1195.

**12.** Darvon is the trade name for Propoxyphene, a pain reliever. PDR at 1132–33. Several of the witnesses also referred to Darvocet, which is another trade name for Darvon.

**13.** Exhibits 1A & 1B are Barker's complete medical record.

### C. Pre–Admission Evaluations and Treatment by Togus PTSD Unit

On May 17, 1988, Barker visited the Mental Health Clinic at Togus accompanied by Kathleen Clement and his oldest sister, Bertlyne Getchell. Barker drank in the car on the way to the hospital. At Togus, Barker lied about his alcohol and Valium abuse to the counsellor and the clerk who assisted Barker with filling out forms describing his condition. Barker's misrepresentations produced the counsellor's conclusion that "[Barker] was no longer abusing Valium (using it only occasionally) and using [alcohol] to relieve agitation [caused by] ex-wife." Record at 309. Neither the counsellor nor the clerk addressed any questions about Barker's alcohol or drug use to Kathleen Clement or Bertlyne Getchell, even though Barker's sisters were present throughout the visit to the clinic.

Barker returned to Togus for a psychological evaluation by Dr. John St. Andre on May 26, 1988. Barker reported his previous abuse of Valium and alcohol and his continuing depression caused by the problems in his relationship with his former wife. Dr. St. Andre also discovered that Barker had a history of Post–Traumatic Stress Disorder (PTSD) which was caused by his Vietnam combat experience. Barker's principal symptoms from the PTSD—nightmares, intrusive memories, explosiveness, acute insomnia—were no longer active. Dr. St. Andre concluded that Barker suffered from mild PTSD and "alcohol abuse, in remission." His recommendation was for no recall or medication. Barker would be permitted to return as needed for counselling. Record at 308–09.

On June 4, 1988, Barker presented at Togus's PTSD Unit complaining of nightmares and flashbacks. The admitting doctor's diagnoses were: "(1) PTSD, (2) stressed by back problems, (3) status postgastrectomy for peptic ulcer disease." The doctor's plan was to admit Barker to the PTSD Unit and proceed with a neurological evaluation and a norgesic forte for back pain. Record at 346. Nurse Roberts noted the following on a supplemental report after speaking with Barker: "Admits to abusing Valium up to 1½ months. Vet states that he has been drinking today.... Denies drinking on a daily basis.... 4 shots of Amaretto—today. 1 shot of Amaretto—yesterday." Record at 329. Nurse Roberts also completed a "Potential for Self–Violence Checklist" which is commonly used to assess the likelihood that a patient will attempt suicide. The completed checklist contained a note on Barker's previous suicide attempt, and Barker's confessions of alcohol and drug abuse, depression, and a history of assaultive behavior. Nurse Roberts assessed Barker as having a low potential for self-violence. Record at 350–51.

Even though he had reported his Valium and alcohol addictions, Barker was given Valium during his hospitalization at Togus. On the evening of June 4, a patient in the PTSD Unit reported that Barker needed help and was in pain. The nurse found Barker grimacing and contorted with muscle spasms. He was unable even to sit in a wheelchair. The doctor on duty examined Barker and prescribed an intramuscular ten-milligram dose of Valium, along with Flexeril and Tylenol. Record at 320, 338. On June 6, Barker was given Valium in the early morning in response to his continuing complaints about back pain. A standing order for five-milligram doses of Valium was entered later that day under the signature of Dr. Bernard MacKinnon, one of the supervising physicians on the PTSD Unit.[14] Four hours later, the Valium order was discontinued because of Dr. MacKinnon's concerns about Barker's Valium dependence. Barker was then given Darvon N–100, Tylenol, and Serax.[15]

On June 7, Barker was examined by Dr. Watanabe who noted that Barker was ex-

---

14. The dispensation of drugs in the PTSD was regularly undertaken by physician's assistants under the supervision of the supervising physicians. Dr. Mackinnon countersigned the prescriptions which were originally signed by a physician's assistant.

15. Serax is the trade name for Oxazepam, a drug used for the short-term relief of anxiety and depression. PDR at 2198.

periencing recurrent episodes of spasms. Dr. Watanabe prescribed physical therapy and Valium to treat the muscle spasms, "if OK [with] ward physician." Record at 321. Dr. MacKinnon discontinued the Valium order later that day. *Id.* On June 8, Barker was brought to physical therapy in "acute distress" suffering for the first time from abdominal "shivering spasms." Record at 326, 341. On June 9, Dr. St. Andre noted the following about Barker's condition: "He requires sedation and bed rest and is not suitable for a psychiatric ward since he is not alert enough to participate in treatment and his physical condition is acute and must be remedied before psychiatric treatment is feasible." Record at 322. On June 10, Barker again experienced abdominal spasms and was again given five-milligram doses of Valium, along with Serax, on an "as-needed" basis. Record at 322, 342. Barker reported that the Valium helped his spasms. He was provided with Valium on June 11 and 12, and reported no spasms on those days. Record at 342.

Donald Mangarelli, a physician's assistant with special expertise in PTSD and substance abuse, examined Barker on June 13. Mangarelli testified that he was especially attuned to the problems of substance dependence since eighty to eighty-four percent of veterans suffering from PTSD also have an alcohol or drug abuse problem. Mangarelli wrote only the following notes about Barker's dependence problems after the examination: "*Drugs*—abuse of Valium recently. *Alcohol*—moderate use. *Tobacco*—1 pkg. a day." Record at 354. In his discharge summary, Mangarelli described Barker's condition as "[a]lcohol dependency, continuous." Record at 357. Mangarelli also noted that Barker had "no suicidal or homicidal ideations." Record at 353. Although Barker informed Mangarelli that he wanted to be discharged, Barker agreed to remain for a neurological consultation with Dr. Sanderson before leaving. On June 14, Barker was examined by Dr.

Sanderson who found Barker to be alert and cooperative.

On June 15, Barker was discharged from Togus. He was given prescriptions for thirty-day supplies of Serax, Darvon, and Paraflex, along with a warning from Mangarelli not to abuse the medications or take them with alcohol.[16] Mangarelli testified that he prescribed only a thirty-day supply of these drugs to insure that Barker would return to Togus for follow-up care. Part of Barker's outpatient care was an appointment on June 20 with Bruce Letsch, a psychiatrist at Togus, for continuing PTSD therapy. But Barker did not keep his appointment with Letsch, and no one at Togus undertook any efforts to contact Barker to determine whether any difficulties had arisen.

The last contact between Burton Barker and anyone at Togus occurred on July 2, 1988 at approximately 3:00 A.M. Barker called the PTSD Unit and told the nurse who was on duty that he was suffering increasing nightmares and loss of sleep. He insisted that the medication was ineffective against the back pain, and admitted to abusing the prescription drugs and alcohol. He told the nurse that he had taken the easy way out during his last hospitalization and that he had requested a discharge as soon as he got the prescriptions he wanted. Barker's efforts to contact Letsch had failed, he told the nurse. The nurse advised Barker to return to Togus.

Barker then called his sister Bertlyne Getchell and told her that he was suicidal. After an extended conversation, he finally agreed to return to Togus. At or about 9:00 A.M., Barker called his sister Kathleen Clement and told her that he was going to Togus. He also called his son Jamie, told him that he was returning to Togus, and asked him to feed their rabbits that afternoon. A few minutes before 6:00 P.M. on July 2, Patricia Barker called the Somerset County Sheriff's office and reported trouble at Barker's residence.[17] A sheriff's

---

**16.** Barker was also given an electrical device which provides relief from muscle spasms called a TENS unit, a moist heating pad, a cold pack, an orthocare bolster, and instructions on how to use each of these items to relieve pain.

**17.** Barker had earlier moved out of his sister's house to a shack in a "camp."

deputy and two EMS attendants forced in the rear door of Barker's house and found Barker lying dead in his bed. A note on the kitchen table, lying next to a survival knife, Barker's service ring, a picture of Jamie Barker, and a lottery ticket, read: "What do I say, it took 20 years. They could not do it, so I did it for them." On the footlocker next to Barker's body were empty prescription bottles which had once contained the Serax (Oxazepam) and Darvon (Propoxyphene) prescribed by Togus. The medical examiner found Barker's death to have been caused by "mixed poisoning, Propoxyphene, Oxazepam and ethanol." Exhibit 14.

## II. STANDARD OF CARE, NEGLIGENCE, AND CAUSATION

The Federal Tort Claims Act (hereinafter Act) provides that "[t]he United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674. As a result, Plaintiff bears the burden of establishing the liability of the United States by showing that a private individual would be liable under state law—Maine law, in this case—for similar conduct in the same circumstances. *Platts v. United States*, 658 F.Supp. 850, 853 (D.Me.1987) (Carter, J.) (citing *United States v. Muniz*, 374 U.S. 150, 83 S.Ct. 1850, 10 L.Ed.2d 805 (1963).

■ Plaintiff must do more than show that Defendant's agents pursued a course of treatment which failed to avoid the injury: "A doctor is not liable for injury resulting when he pursues one of several acceptable courses of treatment meeting the applicable standard of care in the circumstances, even though an alternative procedure also meeting that standard might have avoided the injury." *Roberts v. Tardif*, 417 A.2d 444, 448–449 (Me.1980). Plaintiff must establish three things: (1) the appropriate standard of medical care, (2) the defendant's deviation from the recognized standard of care, and (3) that the conduct which violated the standard of care

was the proximate cause of Plaintiff's injuries. *Ouellette v. Mehalic*, 534 A.2d 1331, 1332 (Me.1988).

The standard of care applicable to Defendant's agents in this case is "that degree of skill and knowledge ordinarily possessed by physicians in [the physician's] branch of medicine...." *Downer v. Veilleux*, 322 A.2d 82, 87 (Me.1974). Expert testimony is ordinarily required to establish the standard of care, the breach of the applicable standard, and causation. The Maine Law Court "has recognized an exception to that rule 'where the negligence and harmful results are sufficiently obvious as to lie within common knowledge.'" *Patten v. Milam*, 480 A.2d 774, 778 (Me.1984) (quoting *Cox v. Dela Cruz*, 406 A.2d 620, 622 (Me.1979)). Dr. Patrick Kamm, Plaintiff's expert, and Dr. Andrew Rothschild, Defendant's expert, agreed as to the applicable standard of care except as noted below.

### A. The Nature and Diagnosis of Alcohol Dependence

Alcohol abuse and alcohol dependence are distinct maladies. Abuse refers either to the taking of an excessive amount of a drug, or to the taking of a drug which should not be taken at all. Dependence describes a physiological or psychological addiction to a drug which requires the ingestion of ever increasing levels of the drug in response to increasing degrees of tolerance. Dependence is generally divided into three classes of severity: mild, moderate, and severe. The experts agreed that Barker's daily consumption of a fifth to a quart of hard liquor demonstrated that he suffered from severe alcohol dependence. Dependence is also characterized by physical withdrawal when the dependent person discontinues taking the drug. Symptoms of withdrawal might include nausea, vomiting, elevated blood pressure, sweating, muscle spasms, and delirium.

The starting place for the appropriate treatment of substance dependence is an accurate diagnosis. The standard of care requires, at a minimum, that a doctor note in a patient's medical record any clear indications that the patient is drinking alcohol

at the same time the patient is ingesting a prescription drug, particularly a benzodiazepine. Benzodiazepines are a family of addictive central nervous system depressants which includes Valium, Librium, and Serax. Alcohol and benzodiazepines are cumulative in their effects on the central nervous system and potentiate each other. They are dangerous when used in combination. As noted earlier, Dr. Watanabe testified that drinking alcohol while using Valium was a clear abuse of the medication. Nonetheless, Dr. Watanabe did not report in Barker's medical record the phone call he received from Kathleen Clement reporting that Barker was drinking alcohol to excess while using Valium. This failure to report the phone call was especially egregious since Barker had previously told Dr. Watanabe that he was using "booze" along with his prescribed Valium and Naprosyn to help ameliorate the muscle spasms in his back. Further, Dr. MacKinnon testified that he would have required a different course of treatment for Barker had he known about Kathleen Clement's phone call. The expert witnesses agreed that Dr. Watanabe's failure to note the call from Kathleen Clement was a breach of the standard of care. The Court so finds.

Because a principal characteristic of dependence is denial, substance-dependent patients frequently minimize or deny entirely their use of alcohol and drugs. Barker's lies to the counsellor and admitting clerk at the Mental Health Clinic on May 17, 1988, and his minimization of his alcohol consumption to Nurse Roberts upon admission to the PTSD Unit on June 4, 1988 and to Dr. St. Andre on May 26, 1988 were manifestations of denial. The expert witnesses disagreed, however, on whether the standard of care requires a doctor, nurse, counsellor, or treatment facility to speak with the substance-dependent patient's family to obtain the facts surrounding the patient's alcohol or drug consumption. Dr. Kamm testified that interviewing the family is required by the standard of care. Dr. Rothschild disagreed, but testified that speaking with the family would be "helpful."

Since denial is a characteristic of dependence and accurate diagnosis of substance dependence is essential, the standard of care requires that the doctor, nurse, counsellor, or treatment facility undertake some investigation beyond speaking with the patient to assess the severity of the patient's abuse of or dependence on alcohol and drugs. Interviewing family members or friends is one appropriate method of investigation, but other methods may also satisfy this standard of care. In this case, neither the Mental Health Clinic nor the PTSD Unit at Togus used any investigative technique other than interviewing Barker to assess the severity of Barker's substance dependence. The record reflects at least two instances when Kathleen Clement and/or Bertlyne Getchell were available to be questioned by Togus personnel during Barker's intake interviews. Both sisters testified that they were ready and willing to provide information about their brother's drinking and drug use. Defendant's failure to investigate Barker's behavior breached the standard of care and produced a series of inaccurate diagnoses of Barker's condition. The natural and proximate consequence of these inaccurate diagnoses was inappropriate care for Barker's alcohol and Valium dependence.

### B. Treatment

The expert witnesses agreed that the standard of care for the treatment of alcohol dependence consists of three components: (1) detoxification, (2) abstinence from all psychoactive agents, and (3) rehabilitation through counselling and group therapy (including the 12–step Alcoholics Anonymous program) to help the dependent person understand and admit to the nature of his disorder.[18] This treatment model takes into account that crossdependence is quite common. A person who is dependent on a substance may use a second addicting substance as a substitute for the first substance. The dependence does not disappear even though the person is not using the substance to which he has a

---

18. According to both Dr. Kamm and Dr. MacKinnon, Togus' inpatient drug and alcohol treatment program was based on this model at the time Barker was a patient in the PTSD Unit.

primary addiction. The dependence is continued by the patient's ingestion of the new addicting substance. For example, alcohol-dependent patients can be expected to suffer from a crossdependence on benzodiazepines. As a result, detoxification must include removing the substance-dependent patient from all addicting substances, not merely the substance to which the patient is currently addicted.

Paradoxically, benzodiazepines are sometimes used to ameliorate the withdrawal symptoms which inevitably accompany the detoxification process for those who are physiologically addicted to alcohol. However, the experts agreed that great care must be taken in the use of benzodiazepines for the treatment of alcohol withdrawal because of the dangers of crossdependence. Dr. Kamm and Dr. MacKinnon testified that the *Physicians' Desk Reference*, which provides the following warnings regarding the use of benzodiazepines, was authoritative for establishing the standard of care:

> Particularly addiction-prone individuals (such as drug addicts or alcoholics) should be under careful surveillance when receiving diazapam [Valium] or other psychotropic agents because of the predisposition of such patients to habituation and dependence.

PDR at 1699.

> Careful supervision of dose and amounts prescribed for patients is advised, especially with those patients with a known propensity for taking excessive quantities of drugs. Excessive and prolonged use in susceptible persons, for example, alcoholics, former addicts, and others, may result in dependence on or habituation to the drug.

PDR at 2198.

> * Do not prescribe propoxyphene [Darvon] for patients who are suicidal or addiction-prone.

> * Prescribe propoxyphene with caution for patients taking tranquilizers or antidepressant drugs and patients who use alcohol in excess.

> * Tell your patients not to exceed the recommended dose and to limit their intake of alcohol.

PDR at 1133. These passages, along with the testimony of the expert witnesses, make clear that the standard of care for the use of benzodiazepines in the treatment of alcohol withdrawal symptoms requires limited and declining doses under the close supervision of qualified medical personnel in circumstances where dependence on the prescribed benzodiazepine is carefully avoided.

■ The treatment provided by Togus while Barker was a patient in the PTSD Unit did not satisfy the standards of care described above. Barker was never detoxified. Although Defendant hammered the point during the cross-examination of Dr. Kamm that Barker was never permitted to ingest alcohol during his inpatient treatment at Togus, this line of questioning completely ignored the problem of crossdependence to which both Dr. Kamm and Dr. Rothschild testified. Barker was given either Valium, Serax, or Darvon every day of his hospitalization in Togus' PTSD Unit. Dr. Kamm's testimony that the provision of benzodiazepines to Barker kept his dependence alive, and may have exacerbated his dependence, was not contradicted either by Defendant's expert witness or the medical professionals who were charged with Barker's care.[19] The Court finds that Barker was not detoxified during his hospitalization in Togus' PTSD Unit.

Defendant attempted to explain its failure to detoxify Barker with the need to treat the acute pain caused by Barker's severe back injury with benzodiazepines. In Dr. Rothschild's view, the record reflects that the benzodiazepines were the only effective treatments for Barker's pain. Dr. Rothschild testified that a refusal to provide Barker with Valium or Serax would have been cruel, and might have been a breach of the standard of care. This argument appears to raise the question of whether the standard of care permits doctors to allow one of the diseases from

---

19. Dr. Kamm testified that, in his opinion, the level and potency of the medication given to

Barker increased after his admission to Togus' PTSD Unit.

which a patient is suffering to continue, or even to intensify, in order to provide an effective treatment for a second disease.

The presence of withdrawal symptoms and the general depressant effect of alcohol and other drugs on the central nervous system [20] often interfere with the accurate diagnosis and treatment of pain caused by unrelated physiological problems, such as physical injuries. The expert witnesses disagreed on whether the pain Barker reported to his doctors was attributable principally to his acute back problem and associated physiological conditions, or if his severe alcohol dependence made it impossible to assess accurately the source of the pain from which he was suffering. Dr. Rothschild testified that Barker's primary diagnosis must have been the physiological problems he was suffering. In Dr. Rothschild's view, a diagnosis of a somatic form of pain disorder would not have been appropriate given the extent of Barker's physical injuries.

Dr. Kamm testified that Barker was likely suffering from "chronic pain syndrome," [21] which Kamm described as the presence of pain beyond that which can be explained by the physiological problems Barker experienced. In Dr. Kamm's opinion, properly diagnosing the pain associated either with Barker's back problems or his PTSD was impossible while he was under the influence of alcohol and drugs. For example, Dr. Kamm testified that the abdominal shivering spasms suffered by Barker on June 8 and June 10 were withdrawal symptoms. Dr. Kamm also testified that Dr. St. Andre's note of June 9 indicating that Barker was not alert enough to participate in treatment demonstrated the physical depressant effects of Barker's ingestion of drugs.

The dispute between the expert witnesses illustrates that the diagnosis and treatment of pain in a patient taking drugs or alcohol is very difficult, if not impossible.

The Court finds that while Barker's physiological deformity was extreme and an obvious and likely source of Barker's pain, Barker's ingestion of substantial quantities of central nervous system depressants substantially interfered with the doctors' ability to determine accurately the level of pain being caused by the physical injury. As a result, the treatment of his physical injury was severely hampered by the doctors' failure to treat Barker's dependence on alcohol and drugs. In sum, Defendant cannot successfully argue that its agents failed to treat Barker's substance dependence in order to better treat his pain, since the proper treatment of pain required eliminating the pain-masking effects of alcohol and drugs. Attempting to treat Barker's pain cannot provide a justification for failing to treat his substance dependence.

The second explanation given by Defendant for the failure to detoxify Barker was the suggestion that the provision of Serax and Valium was intended as treatment for Barker's alcohol dependence. Donald Mangarelli testified that one of his three reasons for prescribing Serax for Barker upon his discharge from Togus was to treat Barker's alcohol dependence. However, the Court has already noted that there exists a specific standard of care for the use of benzodiazepines in the treatment of alcohol withdrawal symptoms. Clearly, Barker was not provided with benzodiazepines in a manner consistent with this standard of care. Neither the quantity nor the frequency of the doses declined during Barker's inpatient treatment. Only a limited effort was made by Dr. MacKinnon to avoid dependence. Upon discharge, Barker was given a thirty-day supply of Serax and Darvon. He was not under close supervision. His doses were neither limited nor declining. Dependence was not carefully avoided. As Dr. Rothschild testified during cross-examination, the medical record

---

**20.** The expert witnesses were careful to distinguish between emotional depression (*i.e.,* a sad mood) and sedation of the central nervous system. The witnesses agreed that alcohol and benzodiazepenes cause the latter. They disagreed as to whether they cause the former.

**21.** "Chronic pain syndrome" is not a formal diagnosis, but a common term employed by doctors to describe a group of psychological factors, including psychosocial stressors, which can exacerbate the pain associated with organic illnesses.

does not indicate that a reasoned, conscious judgment was made by Defendant's agents at Togus to prescribe Valium and Serax for the treatment of alcohol dependence.

In addition, Defendant failed to satisfy the second and third branches of the standard of care for the treatment of alcohol dependence. Barker was not encouraged or required to abstain from all psychoactive agents. And Barker was not provided with any counselling or group therapy relevant to his dependence. In sum, Defendant breached the standard of care for the treatment of Barker's alcohol and drug dependence by failing to provide Barker with any of the requisite components of the appropriate care of that ailment.

■ The Court further finds that providing Barker with a prescription for a thirty-day supply of Serax, Darvon, and Paraflex at the time of his discharge was a breach of the standard of care. Dr. Rothschild testified that the provision of Serax and Darvon to Barker at the time of discharge would not have breached the standard of care if three preventive measures had been taken: (1) the prescription was accompanied by a warning to the patient about the use of alcohol while taking these medications, (2) the patient was monitored, and (3) the amount of the medication prescribed was limited. Yet, Dr. Rothschild later testified during cross-examination that a warning about medication and alcohol was necessarily ineffective when given to an alcohol-dependent patient. One of the salient characteristics of dependence is the use of addictive substances *in spite of the user's knowledge* that the substance is harmful. Dr. Kamm and Dr. MacKinnon concurred in this opinion.

Common sense dictates that an appropriate standard of care cannot include the provision of an inevitably ineffective warning as an effective protection against the abuse of a medication. The standard of care described by Dr. Rothschild clearly is not appropriate for the distribution of benzodiazepines *to an alcohol-dependent patient.* Rather, the appropriate standard

must be consistent with the standard of care described earlier which governs the appropriate treatment of alcohol withdrawal symptoms with benzodiazepines. Doses must be limited and decline over time, there must be close supervision by qualified medical personnel, and dependence on benzodiazepines must be carefully avoided. The record is unambiguous that Barker was not monitored after his discharge. Further, no efforts to insure the eventual discontinuation of Barker's use of benzodiazepines were undertaken. Accordingly, the Court concludes that Defendant breached the standard of care by providing Barker with Serax and Darvon without appropriate safeguards at the time of his discharge. Giving Barker the prescriptions was gross negligence.

### C. Causation

■ Defendant's negligence need not have been either the sole, immediate, or nearest cause of Plaintiff's suicide to satisfy the proximate causation element of liability for negligence under Maine law. *Roberts v. American Chain & Cable Co.,* 259 A.2d 43, 50–51 (Me.1969). Defendant's breaches of the standards of care were the proximate cause, or legal cause, of Plaintiff's suicide only if Defendant's conduct was a "substantial factor" in bringing about Plaintiff's death. *Wing v. Morse,* 300 A.2d 491, 496 (Me.1973).[22]

■ The expert witnesses agreed that there is no certain way to determine whether or not an individual will take his own life. Certain risk factors allow doctors to raise their suspicions that particular patients are in danger. But Dr. Rothschild's unrebutted testimony established that the risk factors are merely life circumstances which many suicide victims have in common. Risk factors are ineffective predictors of suicide. The experts agreed that there were a substantial number of risk factors in Barker's life: his previous suicide attempt, his painful back injury, his divorce and stress-filled relationship with his former wife, his age, and his substance abuse problem. According to Dr. Roths-

---

**22.** In addition, there must be "no rule of law relieving Defendant from liability because of the manner in which [its] negligence has result-

ed in the harm." *Id.* Defendant does not assert that any such rule of law exists.

child, the "Potential for Self–Violence Checklist" is an appropriate method for assessing the likelihood that a patient with a substantial number of risk factors will commit suicide.

While Defendant can be charged with the inappropriate provision of benzodiazepines to Barker, Defendant is not responsible for the severe pain Barker suffered from his back injury, the distress he suffered from his familial circumstances and his PTSD from his service in Vietnam, or his unpleasant living situation. Dr. Kamm testified that the depressant effects on the brain caused by benzodiazepines may cause a patient to become confused, disinhibited, and despondent, and may also cause a patient's aggressive and self-destructive impulses to surface. However, there was no evidence submitted which tends to establish that the Serax and Darvon prescribed for Barker by Togus *in fact* caused the effects hypothesized by Dr. Kamm. To the contrary, Dr. Rothschild testified that Barker's actions before he committed suicide—writing the note, placing the picture of his son, buying the lottery ticket, locking the doors—are inconsistent with disinhibition and confusion.

Further, Dr. Rothschild testified that there is no evidence that the disinhibition which may be caused by benzodiazepines or alcohol is sufficient to make people who have not otherwise been suicidal to become suicidal. In sum, the evidence is insufficient to permit the Court to conclude that Defendant's negligence, separate and apart from the other risk factors in Barker's life, was a substantial factor in Barker's suicide. Accordingly, the Court finds that Plaintiff has not satisfied her burden of establishing that Defendant's negligence was the proximate cause of Burton Barker's suicide.

Accordingly, the Court FINDS that Defendant is not liable under the Federal Tort Claims Act for the death of Burton Barker. Judgment for Defendants is to enter.

So ORDERED.