Kathleen Barker CLEMENT, Individually and as Personal Representative of the Estate of Burton Robert Barker, Plaintiff, Appellant,

v.

UNITED STATES of America, Defendant, Appellee.

No. 91–1839.

United States Court of Appeals, First Circuit.

Heard March 2, 1992.

Decided Nov. 25, 1992.

Julian L. Sweet with whom Paul F. Macri and Berman & Simmons, P.A., Lewiston, Me., were on brief, for plaintiff, appellant.

F. Mark Terison, Asst. U.S. Atty., with whom Richard S. Cohen, U.S. Atty., and David R. Collins, Asst. U.S. Atty., Portland, Me., were on brief, for U.S.

Before TORRUELLA, Circuit Judge, WEIS,* and CAMPBELL, Senior Circuit Judges.

LEVIN H. CAMPBELL, Senior Circuit Judge.

This is an appeal from a judgment entered in the United States District Court for the District of Maine in favor of the United States on plaintiff Kathleen Barker Clement's claim of negligence.[1] Plaintiff sued the United States under the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.*, for the suicide of her deceased brother, Burton Barker. Plaintiff claimed that Barker's suicide was the result of negligent medical care and treatment provided by the Veterans Administration Hospital ("VA Hospital") in Togus, Maine. Following a bench trial, the district court determined that defendant's negligence was not the proximate cause of Barker's suicide. As the district court's determination was not clearly erroneous, we affirm.

I.

Burton Barker, a veteran of the war in Vietnam, suffered from a number of physical and psychological problems. In 1977, he sustained a severe work injury that caused him chronic back pain, and eventually led him, in 1986, to abandon his sheet-rocking business. In 1981, Barker was divorced from his wife, Patricia. After reconciling for a while, he separated from her and from his family in 1985, when they moved to Maine.

In April 1987, Barker again reconciled with Patricia, moving to Maine to be with her and his family. Barker had a history of heavy drinking; his drinking apparently increased after he lost his business and moved to Maine. According to Patricia and to Barker's younger son, Jamie, Barker drank between a fifth and a quart of vodka every day. Barker said that the alcohol eased the pain in his back. Patricia and Kathleen Barker Clement, Barker's sister and a daily visitor at the Barker house, noticed a change in Burton Barker's behavior. Sometimes he would go several days without showering or changing clothes. Finally, on November 13, 1987, Patricia asked Barker to move out. She testified to believing that he had lost his self-esteem.

Barker moved in with his sister, Kathleen. He continued to drink and deteriorate emotionally after the move. Sometime between November 1987 and early 1988, he went to the basement of his sister's home, covered himself with a United States flag, and attempted to stab himself in the stomach. His sister and brother-in-law stopped him before he could take his own life.

Barker went to the VA Hospital on October 23, 1987. In response to Barker's complaints of severe back pain, a physician's

---

* Of the Third Circuit, sitting by designation.

**1.** The district court's opinion appears at 772

assistant at the VA Hospital prescribed Valium[2] and Tylenol # 3,[3] and that Barker consult with an orthopedic surgeon. On December 3, 1987, Barker was examined by Dr. Wilson Watanabe, Chief of the Orthopedics Department. Dr. Watanabe determined that Barker suffered from severe double scoliosis of the dorsal spine and severe lumbar lordosis. At trial, Dr. Watanabe testified that Barker's condition was the worst back deformity he had seen in his years of practice. He recommended against back surgery since it offered no better than a fifty percent chance of success. Rather than renewing the prescription for Valium, Dr. Watanabe prescribed Indocin,[4] an anti-inflammatory drug used to fight fevers and relieve pain.

On December 14, 1987, Dr. Watanabe conducted a follow-up examination of Barker, who repeated his complaints of back pain and muscle spasms. Dr. Watanabe prescribed five-milligram doses of Valium and an anti-inflammatory drug called Naprosyn.[5] Although Dr. Watanabe was concerned that Barker not obtain an excessive quantity of Valium in order to prevent Barker from becoming Valium dependent, he increased Barker's Valium prescription to allow for approximately thirty pills a month for five months.

On April 19, 1988, Barker was examined by Dr. Watanabe for a third time. At this time, Barker complained of muscle spasms so severe they interfered with his walking. Barker told Dr. Watanabe that the Naprosyn was not relieving his back pain, and that while the Valium offered some relief, it was not enough. During this visit, Barker disclosed to Dr. Watanabe that he was using alcohol in conjunction with the Valium in order to ameliorate the muscle spasms. Because Dr. Watanabe was con-

cerned that Barker might be abusing the medication, he decided not to prescribe any additional Valium. Instead, Dr. Watanabe prescribed Paraflex,[6] a muscle relaxant, and Darvon–N 100,[7] a pain reliever used as a substitute for Valium. However, Dr. Watanabe failed to discontinue the Valium prescription he had given to Barker in December, and Barker was able to obtain the final refill of the Valium prescription on May 2, 1988.

At some point between Barker's April 19 examination and May 17, Dr. Watanabe received a telephone call from Kathleen Barker Clement, who reported that Barker "was getting wild" from his abuse of alcohol and prescription drugs. Clement also informed Dr. Watanabe about Barker's attempt to commit suicide. Dr. Watanabe recommended that Clement bring her brother to the Mental Health Clinic at the VA Hospital for an evaluation. Dr. Watanabe, however, failed to document this conversation in Barker's medical record and failed to reduce Barker's intake of prescription drugs. Dr. Watanabe examined Barker on May 3, 1988, and made only the following notation: "Darvon doesn't help. Back on Tylenol # 3. Recall 5/10/88. Need X–ray dorsal lumbar spine lordosis. /s/ W. Watanabe."

On May 17, 1988, Barker sought treatment at the Mental Health Clinic at the VA Hospital. While at the clinic, Barker lied about his alcohol and Valium abuse to both the counsellor and the clerk who helped him fill out forms describing his condition. Neither the counsellor nor the clerk questioned Barker's sisters, who had accompanied Barker to the clinic, about Barker's alcohol or Valium abuse, even though both sisters remained present throughout Bark-

2. Valium is the trade name for Diazepam, a drug used to relieve short-term anxiety disorders and to assist in the relief of muscle spasms. Physicians' Desk Reference at 1698–99 (41st ed. 1987) (hereinafter "PDR").

3. The generic name for Tylenol # 3 is Acetaminophen, which is a drug used to fight fevers and relieve pain. PDR at 1186–88.

4. The generic name for Indocin is Indomethacin. PDR at 1504.

5. The generic name for Naprosyn is Naproxen. Like Indocin, Naprosyn has both fever-fighting and pain-relieving qualities. PDR at 2004.

6. Paraflex is the trade name for Clorzoxazone. PDR at 1195.

7. The generic name for Darvon is Propoxyphene. PDR at 1132–33.

er's visit to the clinic. After interviewing Barker, the counsellor concluded that Barker was no longer abusing Valium and was using alcohol only to relieve agitation caused by his stress-filled relationship with his former wife.

Barker returned to the VA Hospital on May 26, 1988, for a recommended psychological evaluation. During this visit, Barker admitted to recent abuse of Valium and alcohol, but claimed that he was no longer abusing these substances. The attending psychiatrist, Dr. St. Andre, also discovered that Barker had mild Post–Traumatic Stress Disorder ("PTSD"), caused by his Vietnam combat experience. Dr. St. Andre concluded that although Barker suffered from mild PTSD and "alcohol abuse in remission," Barker was stable.

On June 4, 1988, Barker unexpectedly presented himself at the VA Hospital complaining of nightmares and flashbacks to Vietnam combat experiences. The admitting physician diagnosed Barker as suffering from PTSD, aggravated by back problems. Nursing notes taken the day of Barker's admission indicated that Barker: "Admits to abusing Valium up to 1½ months. Vet states that he has been drinking today ... Denies drinking on a daily basis ... 4 shots of Amaretto—today. 1 shot of Amaretto—yesterday."

A "Potential for Self–Violence Checklist," which is commonly used to assess the likelihood that a patient will attempt suicide, was also completed on the date of Barker's hospitalization. The completed checklist noted Barker's previous suicide attempt, his alcohol and drug abuse, and his depression, as well as a history of assaultive behavior. Nonetheless, based on Barker's "contracting" for his physical safety, the nurse who completed the checklist assessed Barker's potential for self-violence as "low."

During his twelve-day stay at the VA Hospital, Barker was given Valium on nu-merous occasions in response to his complaints of severe back pain and muscle spasms, despite his admission that he had been abusing Valium and alcohol. On June 6, Dr. Bernard MacKinnon, one of the supervising physicians on the PTSD ward, entered a standing order for five-milligram doses of Valium, only to cancel it four hours later because of concerns about Barker's Valium dependence. Barker was instead given Darvon N–100, Tylenol, and Serax.[8] The following day, June 7, Dr. Watanabe examined Barker and prescribed physical therapy and Valium to treat the muscle spasms, "if OK [with] ward physician." Dr. MacKinnon discontinued the Valium order later that day. On June 10, after Barker had experienced several days of acute abdominal spasms, Barker was again given five-milligram doses of Valium, along with Serax, on an "as-needed" basis. Barker reported that the Valium helped his spasms. He was provided with Valium for the next two days.

Donald Mangarelli, a VA physician's assistant with expertise in both PTSD and substance abuse, examined Barker on June 13. Mangarelli testified that Barker was alert, cooperative, and had "no suicidal or homicidal ideation."[9] Mangarelli made only the following notation about Barker's substance dependence: *"Drugs*—abuse of Valium recently. *Alcohol*—moderate use. *Tobacco*—1 pkg. a day." Barker informed Mangarelli that he wanted to be discharged, but agreed to remain for a neurological consultation before leaving. In Barker's discharge summary, Mangarelli described Barker's condition as "[a]lcohol dependency, continuous."

Following a neurological examination that indicated no neurological deficit, Barker was discharged from the VA Hospital on June 15. He was given prescriptions for thirty-day supplies of Serax, Darvon, and Paraflex, along with a warning not to abuse the medications or take them in con-

---

8. The generic name for Serax is Oxazepam, which is a drug used for the short-term relief of anxiety and depression. PDR at 2198.

9. A 48–hour nursing assessment, performed on June 9, also noted that Barker had no recent thoughts of suicide.

junction with alcohol.[10] Mangarelli testified that he thought the thirty-day restriction would help ensure that Barker would return to the VA Hospital for aftercare. Mangarelli also scheduled a June 20 appointment for Barker with Dr. Bruce Letsch, a psychiatrist at the VA Hospital, for continuing PTSD therapy. Barker, however, failed to keep his appointment with Dr. Letsch.

At approximately 3 p.m. on July 2, Barker called the PTSD Unit at the VA Hospital and told the nurse on duty that he was suffering from increasing nightmares and insomnia. In tears, he told the nurse that the medication was not relieving his back pain. He admitted to abusing the medication and alcohol. He also said that he had taken the "easy way out" during his hospitalization and that he had requested discharge as soon as he had received the prescriptions he wanted. The nurse advised Barker to return to the VA Hospital for stabilization.

After speaking with the nurse, Barker called his older sister, Bertlyn Getchell, and told her that he was feeling suicidal. His sister testified that by the end of their conversation, Barker did not seem as depressed and agreed to return to the VA Hospital. At 9 a.m. the next day, July 3, Barker called his sister Kathleen Clement and told her he was going to the VA Hospital. Later that morning, he called his son, Jamie, and asked him to feed the rabbits that afternoon. At 6 p.m., when Jamie and his mother arrived at Barker's residence to feed the rabbits, they saw Barker lying in bed, but could not get inside. A sheriff's deputy and two emergency medical personnel forced in the door and found Barker lying dead in his bed. On the kitchen table,

they found a survival knife, Barker's military service ring, a picture of Jamie, and a lottery ticket, together with a note which read: "What do I say, it took 20 years. They could not do it, so I did it for them." On a footlocker beside his bed were two empty prescription bottles, one labeled Serax and the other labeled Darvon. The medical examiner determined Barker's death to have been caused by mixed poisoning: Darvon, Serax, and alcohol.

Barker's sister, Kathleen Barker Clement, brought this action against the United States, alleging that her brother's suicide was caused by the negligent conduct of the VA Hospital in failing to diagnose and treat Barker's alcohol dependency and in prescribing an excessive amount of drugs at the time of Barker's discharge. The district court conducted a two-day bench trial in March 1991 and issued its extensive opinion on July 23, 1991. *See* note 1. The district court found that the VA Hospital had "breached the standard of care for the treatment of Barker's alcohol and drug dependence by failing to provide Barker with any of the requisite components of the appropriate care of that ailment." 772 F.Supp. at 30. The district court further found that the VA Hospital had "breached the standard of care by providing Barker with Serax and Darvon without appropriate safeguards at the time of his discharge."[11] *Id.*

The district court held, however, that defendant's negligence was not the proximate cause of Barker's suicide. Rejecting plaintiff's primary theory that the mismanagement of the drugs, interacting with Barker's alcoholism, had caused Barker to become confused and to lose control over self-

---

**10.** In addition to the medication, Barker was given an electrical device, called a TENS Unit, which provides relief from muscle spasms. Barker also received a moist heating pad, a cold pack, an orthocare bolster, and instructions on how to use these items to relieve back pain.

**11.** According to the district court, the standard of care for the use of benzodiazepines in both the treatment of alcohol withdrawal symptoms and the prescription upon discharge requires "limited and declining doses under the close supervision of qualified medical personnel in

circumstances where dependence on the prescribed benzodiazepine is carefully avoided." 772 F.Supp. at 28, 30. In finding the Hospital negligent, the court concentrated upon its failure to take appropriate measures to avoid increased drug and alcohol dependence. The court did not address the separate question whether or not Serax's and Darvon's potential as suicide weapons may have made it negligent to prescribe them to someone like Barker. Nor, as discussed below, was the latter point an express focus of plaintiff's arguments to the court.

destructive tendencies, the court found no evidence that the Serax and Darvon prescribed for Barker at the VA Hospital caused the disinhibition and confusion hypothesized by plaintiff's expert. 772 F.Supp. at 31. The court noted testimony by defendant's expert of a lack of evidence that the disinhibition which may be caused by benzodiazepines or alcohol is sufficient to make people who have not otherwise been suicidal to become suicidal. *Id.* The district court concluded that "the evidence is insufficient to permit the Court to conclude that Defendant's negligence, separate and apart from the other risk factors in Barker's life, was a substantial factor in Barker's suicide." *Id.* at 31.

On appeal, plaintiff contends that the district court applied an erroneous legal standard when it isolated defendant's negligence from Barker's risk factors for suicide in its analysis of proximate causation. Plaintiff argues that in determining whether defendant's negligence was a substantial factor in causing Barker's suicide, the district court should have considered defendant's negligence in light of all the risk factors present in Barker's life, rather than separately and apart from them.

## II.

■ We review questions of negligence and proximate causation under the clearly erroneous standard. *Goudy & Stevens, Inc. v. Cable Marine, Inc.,* 924 F.2d 16, 19 (1st Cir.1991); *Deguio v. United States,* 920 F.2d 103, 105 (1st Cir.1990); *Obolensky v. Saldana Schmier,* 409 F.2d 52, 54 (1st Cir.1969). Under this standard, we will upset a district court's finding of fact or a district court's application of a correct legal standard to the facts only when, after reviewing the entire record, we are "left with the definite and firm conviction that a mistake has been committed." *Deguio,* 920 F.2d at 105 (quoting *United States v. United States Gypsum Co.,* 333

U.S. 364, 68 S.Ct. 525, 92 L.Ed. 746 (1948)). However, if it should appear that a district court applied an erroneous legal standard to the facts, our review will be *de novo. Puerto Rico Ports Authority v. M/V MANHATTAN PRINCE,* 897 F.2d 1, 4 (1st Cir.1990).

Here, contrary to plaintiff's contentions, we think a fair reading of the district court's opinion reveals that the district court applied the correct legal standard in determining whether defendant's negligence was a substantial factor in causing Barker's suicide. *See supra.* Thus, we review the district court's finding with respect to proximate causation only for clear error and, doing so, we do not find that the court clearly erred.

## III.

■ Having been brought pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671 *et seq.,* this case is governed by the substantive law of Maine, the place where defendant's alleged negligence occurred.[12] Under Maine law, as elsewhere, a defendant's negligent conduct is actionable only if it is the legal or proximate cause of harm to another. *Brewer v. Roosevelt Motor Lodge,* 295 A.2d 647, 652 (Me.1972). According to the Supreme Court of Maine, a negligent act is the proximate cause of harm if "(a) the actor's conduct is a *substantial factor* in bringing about the harm, and (b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm." *Wing v. Morse,* 300 A.2d 491, 495–96 (Me.1973) (emphasis in original); *see* Restatement (Second) of Torts § 431 (1965).

■ When determining whether a negligent act was a substantial factor in bringing about an injury, a court must determine both whether the negligence *in fact* caused the injury and whether the injury was *reasonably foreseeable.*[13] *Brewer,* 295 A.2d

---

**12.** The Federal Tort Claims Act operates as a broad waiver of the United States' sovereign immunity, granting district courts jurisdiction to hear tort suits against the United States for damages caused by its employees acting within the scope of their employment, where the Unit-

ed States, if a private party, would be liable under the law of the place where the tort occurred. 28 U.S.C. §§ 1346(b), 2674.

**13.** Some courts and commentators restrict the "substantial factor" test to the determination of whether negligent conduct in fact caused a par-

at 652 ("[r]easonable foreseeability of injury is the foundational basis for proximate causation"); *Spickler v. York*, 566 A.2d 1385, 1390 (Me.1989) (mere possibility that negligence caused injury is insufficient to prove legal causation). Causation–in–fact is, by definition, a factual inquiry which requires a court to determine if an injury would not have occurred but for a defendant's negligence, or, in the situation where there are two or more causes, each of which by itself is sufficient to bring about an injury, whether the defendant's conduct was a substantial factor in bringing about the injury. Restatement (Second) of Torts § 432.[14] An injury is reasonably foreseeable when a defendant's negligent conduct "creates a risk that might reasonably be expected to result in such injury or damage, even though the exact nature of the injury or damage need not, itself, be foreseeable." *Fowler v. Boise Cascade Corp.*, 948 F.2d 49, 53 (1st Cir. 1991).

■ As noted previously, plaintiff's argument on appeal is that the district court erred as a matter of law in stating that defendant's "negligence [i.e., in mismanaging Barker's alcohol and drug treatment], separate and apart from the other risk factors in Barker's life, was [not] a substantial factor in Barker's suicide." This ignores the fact, says plaintiff, that many events, including suicide, have many causes, and that negligence need not be the sole or even predominant cause so long as it is a substantial factor in the ultimate result. We agree with plaintiff, that read in isolation, the quoted sentence is somewhat enigmatic. However, a few sentences earlier the district court also stated, very clearly, that "[d]efendant's negligence need not have been either the sole, immediate, or nearest cause of [Barker's] suicide to satisfy the proximate causation element of liability for negligence under Maine law." *Clement v. United States*, 772 F.Supp. 20, 31 (D.Me.1991). Moreover, the court's analysis overall, *infra*, is inconsistent with the court's having found that defendant's negligence was a substantial factor in the tragic result. A fair reading of the district court's analysis of causation compels the conclusion that the court both understood and applied the correct standard in determining causation-in-fact. The district court's findings flatly rejected the theory of proximate causation advanced by plaintiff and its expert, Dr. Kamm, at trial. The essence of this theory was that mixing the prescribed drugs with Barker's pre-existing alcoholism had the effect of enhancing Barker's suicidal tendencies. According to Dr. Kamm, the combination of the drugs and alcohol can cause a patient to become confused and to lose control over self-destructive tendencies. In Dr. Kamm's opinion, the prescription of Serax and Darvon "worsened [Barker's] pre-existing substance abuse problem causing continued deterioration mentally.... And the

ticular injury. *E.g.*, Prosser, Law of Torts, § 42, at 248 (4th ed. 1971); 4 Harper, James & Gray, The Law of Torts, § 20.6, at 182 (1986). These commentators see the "proximate causation" test as a second analytical step involving policy determinations such as reasonable foreseeability. It is arguable whether the Maine Law Court and the Restatement (Second) of Torts § 431 adopt this view of causation. *Compare* Prosser, *supra* (1948 revision of the Restatement limited the application of the substantial factor test "to the fact of causation alone") *and* 4 Harper, James & Gray, *supra* (same) *with* Wright, *Causation in Tort Law*, 73 Cal.L.Rev. 1735, 1782 (1985) (substantial factor test's incorporation of both causation-in-fact and proximate causation issues persists in the Restatement (Second) of Torts "despite an attempt by Prosser and others to confine the substantial factor formula to the question of causation-in-fact."). The semantic formulation of the test of causation, however, is less important than its practical application, which in Maine clearly calls for both a determination as to causation-in-fact and reasonable foreseeability.

14. Section 432 provides:

Negligent Conduct as Necessary Antecedent of Harm
(1) Except as stated in Subsection (2), the actor's negligent conduct is not a substantial factor in bringing about harm to another if the harm would have been sustained even if the actor had not been negligent.
(2) If two forces are actively operating, one because of the actor's negligence, the other not because of any misconduct on his part, and each of itself is sufficient to bring about harm to another, the actor's negligence may be found to be a substantial factor in bringing it about.

prescription of those two drugs contributed to his death by worsening his alcohol problem."

In rejecting Dr. Kamm's theory, the district court found that there was "no evidence submitted which tends to establish that the Serax and Darvon prescribed for Barker by [the VA Hospital] *in fact* caused the effects hypothesized by Dr. Kamm." 772 F.Supp. at 31 (emphasis in original). There is ample support for this finding in the record. As the district court pointed out, "Barker's actions before he committed suicide—writing the note, placing the picture of his son, buying the lottery ticket, locking the doors—are inconsistent with disinhibition and confusion." *Id.* Moreover, there was testimony from the expert witness called by defendant, Dr. Anthony Rothschild, that drugs and alcohol will not cause a person to feel suicidal unless the person has suicidal tendencies in a sober state. Given the substantial support in the record for the district court's conclusion that defendant's negligence did not in fact cause Barker's suicide, we are unpersuaded that the conclusion was clearly erroneous. *See Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985) (fact finder's choice among reasonable views of the evidence cannot constitute clear error).

Although the district court's determination concerning causation-in-fact disposes of the case, we feel compelled to say a few words about an additional theory of negligence—one which plaintiff did not expressly present to the district court and which she mentioned only in passing to this court. Under that theory, the VA Hospital arguably violated medical standards of due care by sending Barker home with a thirty-day prescription of Serax and Darvon *because he was suicidal* and because the drugs were a foreseeable means of his taking his own life. There is some suggestion in the literature and case law that a cause of action may lie against a psychiatrist for the suicide of an unconfined patient where the psychiatrist prescribes a quantity of pills

capable of being fatal if taken all at once and where the psychiatrist should have anticipated the probability that the patient would seek to take his own life. *See* Schwartz, *Civil Liability for Causing Suicide: A Synthesis of Law and Psychiatry,* 24 Vanderbilt L.Rev. 217, 246–47 (1971); *Speer v. United States,* 512 F.Supp. 670, 678 (N.D. Texas 1981) (noting potential cause of action, but concluding that patient's suicide was not reasonably foreseeable), *aff'd,* 675 F.2d 100, 100 (5th Cir. 1982).

This was simply not a theory, however, on which the instant plaintiff presented her case to the district court, nor was it a theory expressly addressed in the expert testimony. Plaintiff's focus at trial, as already explained, was upon how the drugs and the failure to treat Barker's alcoholism may have worked together to heighten Barker's suicidal mind-set.[15] Plaintiff's expert testified in support of this theory. That the drugs were potential suicide weapons, and that the doctors violated medical standards by prescribing them *because Barker was likely to use them to commit suicide,* was not a theory the plaintiff fleshed out in expert testimony nor was it argued to the district court. The district court understandably, therefore, did not address that theory, nor, without more specific expert testimony as to relevant medical standards, would a finding of negligence on this ground have even been supportable. In any event, as the theory was not articulated to the district court, plaintiff may not raise it for the first time on appeal. *E.g., Boston Celtics Ltd. Partnership v. Shaw,* 908 F.2d 1041, 1045 (1st Cir.1990); *United States v. Ven–Fuel, Inc.,* 758 F.2d 741, 760 (1st Cir.1985). We, therefore, see no basis for a remand to explore the ramifications of such a theory.

Moreover, to the extent any such theory may be said to have been raised even inferentially below, the district court's factual findings following the two-day trial

---

**15.** For example, in plaintiff's post-trial memo, plaintiff argued only the following theories of negligence: 1) failure to do an appropriate intake and to interview Barker's family members in order to determine alcohol dependency; 2) failure to reach the correct diagnosis of alcohol dependency; and 3) failure to treat Barker's alcohol dependency.

strongly indicate that the district court did not accept it. The court said:

> The expert witnesses agreed that there is no certain way to determine whether or not an individual will take his own life. Certain risk factors allow doctors to raise their suspicions that particular patients are in danger. But Dr. Rothschild's unrebutted testimony established that the risk factors are merely life circumstances which many suicide victims have in common. *Risk factors are ineffective predictors of suicide.* The experts agreed that there were a substantial number of risk factors in Barker's life: his previous suicide attempt, his painful back injury, his divorce and stress-filled relationship with his former wife, his age, and his substance abuse problem. According to Dr. Rothschild, the "Potential for Self–Violence Checklist" is an appropriate method for assessing the likelihood that a patient with a substantial number of risk factors will commit suicide.

772 F.Supp. at 31 (emphasis added). Utilizing the "Potential for Self–Violence Checklist," a nurse had assessed Barker's potential for self-violence as "low." [16] We infer from the quoted language that the court did not believe that the likelihood of misuse of the drugs to commit suicide was so evident as to have contra-indicated the issuance of the thirty-day prescriptions *for that reason* alone. We cannot say such a conclusion is unreasonable on this record, lacking, as it does, any expert testimony geared to this particular theory of negligence.

As we find no legal error and no clear factual error, we affirm the judgment below.

*Affirmed. Costs to appellee.*

16. According to Dr. Rothschild, the prescriptions given to Barker on discharge were appropriate "because there was no evidence in Mr. Barker's case that he was feeling suicidal or despondent about taking his life."