**Lora LEVESQUE, Plaintiff**

v.

**UNITED STATES of America, Defendant**

**No. CIV. 4–19–B–K.**

United States District Court, D. Maine.

Feb. 3, 2005.

Daniel G. Kagan, Berman & Simmons, P.A., Benjamin R. Gideon, Berman & Simmons, P.A., Lewiston, ME, for Plaintiff.

Evan J. Roth, Office of the U.S. Attorney, District of Maine, Portland, ME, for Defendant.

## MEMORANDUM OF DECISION [1]

KRAVCHUK, United States Magistrate Judge.

On January 28, 2005, I conducted a bench trial in the above-referenced action. I now enter the following findings of fact and conclusions of law. Based upon these findings and conclusions I direct the clerk to enter judgment on behalf of the minor plaintiff BB in the amount of $95,000.00 plus costs.

### Findings of Fact

On January 19, 2003, fifteen year old BB made two trips with his father from his uncle's residence on Route One in Aroostook County to the County Quick Stop, a local convenience store a short distance away, also on Route One. Both the uncle's residence and the store were south of Caribou, Maine. The roads were snow covered and it was snowing at the time of both trips. On each occasion Richard Bouchard, BB's father, drove a blue Dodge Daytona and BB rode in the front passenger's seat. The first trip was uneventful as the parties traveled down a hill, went inside the store, and then back up the hill without incident. Approximately 10 to 15 minutes after the first trip father and son

---

1. Pursuant to 28 U.S.C. § 636(c), the parties have consented to have United States Magistrate Judge Margaret J. Kravchuk conduct all proceedings in this case, including trial, and to order entry of judgment.

embarked on a second trip to the same store. This second trip was for the purpose of purchasing cigarettes for BB's aunt. The elder Bouchard had expressed reluctance about returning to the store because he believed the driving conditions were deteriorating.

BB and his father turned into the roadway and proceeded down the hill toward the convenience store. They were traveling approximately 30 miles per hour and were proceeding in their proper lane of travel. Route One consists of three lanes at this point, one lane heading down the hill and two lanes heading up the hill. Light snow was falling and blowing on the roadway. Senior Border Patrol Agent Dennis Harmon was proceeding up the hill in his government service vehicle, a Dodge Durango SUV. Harmon was traveling in the passing lane on the uphill side, going approximately 45 miles per hour, and employing two-wheel rather than four-wheel drive. He lost control of his vehicle and it spun ninety degrees counterclockwise into Bouchard's route of travel. Bouchard did not have time to take any evasive action and his vehicle struck the front end and passenger side door of Harmon's vehicle. While Bouchard says he saw Harmon actually in the process of passing another vehicle, I do not credit that assertion because of the poor visibility and the nature of the unfolding events. However, by Harmon's own admission, he was in the passing lane. He says the reason he was in the passing lane was that the lane had been plowed and the other lane had not.

The impact was substantial, causing considerable damage to both vehicles and necessitating the arrival of the "jaws of life" in order to extricate BB and Bouchard from the vehicle. BB experienced considerable pain and suffering at the scene, being cold, scared and trapped for almost one hour. His father was in considerable pain and BB's distress included his fear for his father as well as his fear about his own condition. Although he lapsed in and out of consciousness, he was lucid enough to experience considerable discomfort at the scene of the accident.

Harmon, from Jackman, Maine, knew about driving on Maine roads in the winter. He recognized that his vehicle had four-wheel drive and that by engaging the four-wheel drive mechanism he would improve his traction on snow covered roads. In fact earlier that day, when Harmon drove from Houlton to Caribou to pick up a border patrol canine from a kennel, he had the vehicle in four-wheel drive for the entire trip. Upon commencing his return trip, as he drove through downtown Caribou he determined that the roads had been recently plowed and decided to disengage the four-wheel drive mechanism. When he left the immediate downtown area he remained in two-wheel drive.

Harmon's speed, self-described as approximately 45 mile per hour, was obviously too fast for the prevailing conditions. A trooper who responded to the accident reported that he traveled between 40 and 45 miles per hour to get there and he was traveling as fast as possible with his blue lights and siren engaged. A prudent driver, not in an emergency situation, would not have been traveling at those speeds in my view. I reject the notion that conditions had improved between when Harmon drove into Caribou and when he encountered the Bouchard vehicle on his return trip and then suddenly deteriorated again. Harmon's testimony is that the accident occurred within a brief window of fair road and weather conditions. By Harmon's own report the roadway was snow covered, but "appeared bare in the tire tracks of the travel lane." That description of the roadway, coupled with the blowing snow and continuing snowfall, and the testimony

of BB and his father, convinces me that the conditions were much worse than those described by Senior Patrol Agent Harmon. Furthermore, the ambulance run sheet indicates that the accident call was received at 6:30 p.m. and the testimony supports that the call would have been made shortly after the accident occurred. Thus Harmon, an experienced Maine driver, would have known that since the sun had gone down, the snow continued to fall and blow into the roadway, and the road itself was snow covered, it was highly likely that the road would contain icy spots. This case is not a situation where a motorist suddenly encountered glare or "black" ice on a roadway that otherwise appeared to be free of ice and snow.

There is no expert evidence one way or the other as to whether engaging the vehicle's four-wheel drive would have prevented the accident. However, the evidence does establish that four-wheel drive improves traction and the accident occurred because Harmon's vehicle lost its traction going up the hill. I think the evidence about the failure to engage the four-wheel drive supports the conclusion that Senior Patrol Agent Harmon was not driving in a prudent manner given the prevailing conditions. Harmon had prudently used the four-wheel drive option when driving up to Caribou fortyfive minutes earlier. Even though he may have found conditions marginally better in downtown Caribou, the situation on Route One at the scene of the accident demanded greater care on his part. At a bare minimum he should not have been traveling at the speed he described, and a prudent driver having the option would have been in four-wheel drive. I am comfortable in finding that his excessive speed was a proximate cause of this accident, even if I am unable to find that the use of two-wheel drive may or may not have been in and of itself a proximate cause of the accident.

After the vehicle spun out of control there was no possibility for either party to avoid the impact. Senior Patrol Agent Harmon acted reasonably and prudently after the impact to call for aid and take the necessary safety precautions at the scene. BB suffered a great deal of pain, and possibly the additional injury of a broken great toe while the rescue workers extricated him and his father from the vehicle. His leg and foot were caught somewhere under the dash and metal had to be bent back and cut out in order to get his leg out of the vehicle.

BB was taken to the Aroostook Medical Center. He was diagnosed with a ruptured spleen, broken great toe, and superficial lacerations. He was in stable condition, but placed in ICU in order to be closely monitored in the event of internal bleeding. Initially, it was unknown whether surgical intervention would be necessary vis-à-vis the ruptured spleen. At the time of his admission X-rays were taken, but the chest x-rays were read as negative. BB's experience at the hospital was terrifying for him, not only because of his own condition, but also because he could hear his father screaming in an adjoining room.

BB progressed well in the hospital and ultimately the ruptured spleen did not require any surgery. On January 23, 2003, after a five day hospital stay, BB was discharged to return to his mother's home in Waterville. Lora Levesque is his mother and the nominal plaintiff in this action. During the hospital stay BB had been confined to strict bedrest. Upon his discharge he was advised to rest at home for several weeks without going to school. He was also restricted from contact sports for at least three months. The contact sport restriction was significant to BB because he played soccer and had hoped to develop his soccer skills with an eye toward a

possible scholarship following high school graduation.

On January 31, 2003, BB was seen by his regular pediatrician, Charles E. Danielson, M.D., in Waterville, Maine. By this point in time BB was complaining of extreme chest pain. An x-ray taken at a Waterville hospital on January 31 revealed that in addition to the other injuries BB suffered a depressed facture to the upper portion of his sternum. This sternum fracture has ultimately proven to be the most problematical of the injuries that BB suffered. However, there is no treatment available for the poorly healed fracture. BB's mother was informed of that fact on February 5, 2003. Dr. Danielson's January 31 office note indicates that BB presented that day with a variety of post traumatic problems, including back pain.

BB next visited his Waterville doctors' offices on May 5, 2003, in connection with a knee injury he received while "horsing around." The doctor's notes indicate that the next contact they had with BB's mother was on September 5, 2003, when she called to report that BB had "reinjured his spleen." On September 23, 2003, BB saw Dr. Danielson, but his primary complaints at that time related to a rash and worsening acne. He also reported that one or two months prior, during the summer of 2003, he had strained his chest while reaching and turning, aggravating the pain in the area of the fractured sternum. The doctor at that point advised BB to gradually increase his activities, avoiding contact sports. The problem regarding his sternum was diagnosed as a "non-union," meaning the fracture had not healed fully, resulting in pain and a continuing concern about additional injury to his chest.

BB next visited his family doctor on October 4, 2003, in conjunction with treatment for an ingrown toenail. There is no mention of back pain or the chest injury during this doctor's visit. On January 12, 2004, shortly before the commencement of this lawsuit, BB and his mother visited his doctor's office complaining of sharp back pain during the past two weeks. BB explained during the trial that sometime around Christmas 2003 he first experienced excruciating back pain when he rolled over in bed and heard "something pop." Prior to that event there had been intermittent back pain since the time of the accident, but after Christmas 2003 the pain was so severe that his legs would give out. The doctor ordered x-rays and bone scans of the back and lumbar region and the reports failed to identify any abnormality. BB was referred for a course of physical therapy, but did not find it to be helpful. The pediatrician's notes indicate that on April 6, 2004, an MRI was done on BB's back. Nothing abnormal was found. After the MRI a referral was made to a Dr. Kimball, but the parties have stipulated that BB never treated with a Dr. Kimball. The records do reflect that BB discontinued physical therapy because he did not find it helpful.

BB's special damages are limited to his medical expenses, consisting of $24,474.18 in doctors' and hospital bills and other expenses, including $3,862.00 of post-January 12, 2004, expenses related to an MRI of the lumbar region, physical therapy for the back, and services in Aroostook County at the Aroostook Wellness Center & Acupuncture. The other components of BB's damages include the considerable pain and suffering he endured at the scene and in the immediate aftermath of the accident. Additionally, he has suffered emotional distress and the loss of enjoyment of life, primarily in connection with the sternum injury. BB has to live with the knowledge that his chest injury has made him more vulnerable to additional injury in that area and the potential for

serious harm is considerable. The sternum fracture is such that if the bone were to be broken again it could damage his aorta or other significant blood vessels leading to his heart. Because he fears the potential of reinjury, BB understandably continues to restrict those activities that might foreseeably involve direct contact with his chest. However, the accident has not prevented BB from participating in track and field events, (except for the shotput, which requires throwing that could strain his chest and/or back). BB also participates to some degree in snowmobiling and riding his ATV.

I am persuaded that the intermittent back pain has existed since the time of BB's first office visit with Dr. Danielson in 2003. I therefore find that the medical expenses associated with that back pain should be recoverable in this action. However, I do not find that the back pain, in and of itself, is so debilitating or significant to be considered as any more or any less than part of the same continuing limitation on BB's activities that is caused by the sternum fracture. In other words, his back and chest pain are continuing persistent problems that cause him to experience "aches and pains" that are more normally associated with older people than with healthy seventeen year old boys.

On the emotional side of the scale, BB and his mother suggest that the accident has caused him to drop out of school, lose the ability to compete for soccer scholarships, and generally to be more socially withdrawn. It is extremely hard to evaluate this testimony, especially given the complex reasons that might underlay BB's decision to drop out of school and choose to move to Aroostook County to live with his father. It is clear that this accident has changed BB's life and left a lasting emotional scar upon him. It was not a minor traffic accident and while BB's most significant injury, the ruptured spleen, did heal nicely and apparently does not cause him any lasting problems, the constellation of his injuries do continue to have an ongoing effect upon him both emotionally and physically. In my opinion, $95,000.00 represents an amount that will reasonably compensate BB for all of his recoverable damages.[2]

## Conclusions of Law

The Federal Tort Claims Act provides that "the United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances[.]" 28 U.S.C. § 2674. The plaintiff bears the burden to establish the liability of the United States "by showing that a private individual would be liable under state law—Maine law in this case—for similar conduct in the same circumstances." *Clement v. United States*, 772 F.Supp. 20, 26 (D.Me.1991).

 In order to prove negligence BB must establish that Senior Agent Harmon breached a duty of care and that the breach was a proximate cause of BB's injury and consequent damages. *Crowe v. Shaw*, 2000 ME 136, ¶ 9, 755 A.2d 509. "Evidence that a motorist was traveling at a speed in excess of the posted limit, or even at a lesser rate of speed if unreasonable under the particular circumstances,

2. This factual finding is not connected to the administrative demand notice referenced in ¶ 2 of the Complaint. During closing argument counsel for plaintiff alluded to the amount of that administrative demand, but I arrived at my assessment of reasonable compensation independently of the argument made by counsel. The amount of that demand was not formally introduced at trial nor is it otherwise part of the record. During closing argument I sustained the Government's objection to counsel's attempt to argue a specific amount of damages to the court.

can give rise to a finding of negligence." *Poirier v. Hayes,* 466 A.2d 1261, 1263 (Me. 1983); 29–A M.R.S.A. § 2074 ("An operator shall operate a vehicle at a careful and prudent speed not greater than is reasonable and proper having due regard to the traffic, surface and width of the way and of other conditions then existing."). In the present case Harmon's speed of at least 45 miles per hour on the roadway in question was too fast for the prevailing conditions and it was a proximate cause of the accident.

Although the Government raised the "emergency doctrine" as relevant to my evaluation of Harmon's negligence, I do not find that it is applicable. The emergency doctrine does not apply if there is sufficient time in which to take deliberate action after being confronted with a perilous situation. *Hixon v. Mathieu,* 377 A.2d 112, 115 (Me.1977). In my view of the evidence, the perilous situation existed before Harmon spun out of control. Were the negligence based upon anything Harmon did or failed to do after the vehicle went into the skid, the emergency doctrine might apply. My finding of negligence, however, is based upon Harmon's pre-accident conduct.

■ BB is entitled to recover as damages the reasonable value of his medical expenses reasonably required and used by BB in treatment for his accident related injuries. I conclude that the costs contained within the stipulated summary of medical expenses represent that reasonable value. While the Government disputes BB's right to recover for expenses related to the lumbar injury, my factual findings allow recovery for those expenses. Even though I may have not found there to be a substantial degree of impairment from the continuing back pain, it was a reported injury at the first doctor's visit and it is reasonable that BB, his mother, and his physician would want to have these tests done to try to discover an organic cause for the pain and discomfort. It would not have been questioned if these tests (the most expensive component of this portion of the damages) had been ordered in January 2003, given the magnitude of the accident and the nature of BB's complaints about pain.

In addition to medical expenses BB incurred, he is also entitled to be compensated for any pain, suffering, mental anguish and loss of enjoyment of life already suffered and caused by Harmon's negligence and for any pain, suffering, mental anguish and loss of enjoyment of life which I find he is reasonably certain to suffer in the future because of Harmon's negligence. *Gilmore v. Cent. Me. Power Co.,* 665 A.2d 666, 671 (Me.1995). BB has established that he has lost the ability to compete in contact sports and engage in other vigorous activities that would be normal for someone of his age. Additionally, the pain he suffered at the accident scene and in the immediate aftermath was considerable. While his major physical problems have healed fairly well, residual pain does remain and does limit his pursuit of recreational activities.

Accordingly, I direct the clerk to enter judgment as indicated above.

***So Ordered.***