Doreen **GRAY**, Plaintiff

v.

**UNITED STATES of America,**
**Defendant.**

**Civil No. 2:10–cv–467–DBH.**

United States District Court,
D. Maine.

Feb. 17, 2012.

Peter Clifford, Hodsdon & Clifford, LLC, Kennebunk, ME, for Plaintiff.

John G. Osborn, Evan J. Roth, Assistant United States Attorney, Portland, ME, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

D. BROCK HORNBY, District Judge.

This is a lawsuit in which a Post Office patron seeks damages on account of her fall on the Sebago Post Office entrance sidewalk on January 2, 2009. I conducted a bench trial on January 18 and 19, 2012. These are my findings of fact and conclusions of law.

### FINDINGS OF FACT

1. January 2, 2009 was sunny and cold in Sebago, Maine, Joint Stipulations at 1 (Docket Item 56), but it did not snow that morning.

2. The Postal Service used independent contractor A.T. Greene for "plowing and removal of snow from parking lot and sidewalks" at the Sebago Post Office. Gov't Ex. 7. According to Greene's records, those surfaces were "very icy" before he treated them on December 26, 2008 at 6:30 a.m. Pl. Exs. 7, 16. Greene also reported

"sleet and freezing drizzle" the next day, December 27, 2008. Pl. Ex. 7; Gov't Ex. 9. He treated the parking lot and sidewalks that day at 7:40 a.m. *Id.* Greene reported no other precipitation between then and January 2, 2009. However, he re-treated the Post Office walkways and driveway on December 30 at 8:30 a.m. and the walks alone on December 31 at 8:15 a.m. Gov't Exs. 8, 9. For each of these treatments, Greene treated the sidewalks only with salt, which was all that the Post Office provided. The parties presented no evidence about shoveling or other sidewalk clearing on these days.

3. January 1, 2009 was a cold day with temperatures ranging from a low of –0.2°F to a high of only 17.9°F. Pl. Ex. 20.[1] Greene did not treat the Post Office sidewalks that day. The Post Office was closed because it was New Year's Day.

4. On January 2, 2009, Amber Dearborn, the officer in charge of the Sebago Post Office, arrived at work between 7:30 a.m. and 7:45 a.m. Although Dearborn does not have a specific recollection of that day's events before the accident, she testified that her custom is to enter the Post Office through the back door and, among other things, to step out onto the dock area to see how the employee walkway looks. Then, after some other activities inside, her custom is to unlock and open the two public entrances from the inside at 7:45 a.m. (opening time for Post Office box access) and, in doing so, to take a step or maybe two outside to look at the condi-

tions. Then, at 8:30 a.m., she unlocks and opens the sliding door to the retail space and looks through the windows at the sidewalks. Although Dearborn spends most of her working time thereafter in a back workroom, she testified that whenever she does go into the lobby, she again looks through the windows at the sidewalks. On January 2, 2009, before the accident, she saw nothing unusual about the walkways from her various vantage points.

5. According to his report, contractor Greene "salted entire lot and treated all walkways" at 8:45 a.m. Pl. Ex. 7; Gov't Ex. 8–1. As was his custom, he did not use sand on the walkways but used only the salt that the Post Office provided. The temperature then was 8.5°F, according to the weather records admitted into evidence. Pl. Ex. 20.

6. Greene testified that, in his experience, salt starts to melt ice and snow in the shade only when the outside temperature reaches 18°F.[2] The parties have stipulated that it was sunny the morning of January 2, 2009, but they presented no evidence about the timing of shadow and sun on the Sebago Post Office walkways. Joint Stipulations at 1. Greene testified that "as the day goes on, the sun hits that area"—meaning the walkways on which Gray slipped and fell. However, there was no indication of when that would have been on January 2, 2009 except Greene's written report indicating that, at the time of the

1. These records were provided by Weather Underground, a weather web site, and populated with data reported by the site's weather station in East Sebago, Maine. Admittedly, the data were not collected from the Post Office parking lot. However, the records were admitted without objection, and with the exception of a single temperature estimate provided by A.T. Greene, they are all that the parties provided to document the weather

conditions preceding and including January 2, 2009.

2. Although no other evidence was introduced on the topic, I take judicial notice that other variables including the nature of the surface, the concentration of the salt brine, and the type of salt compound can have an effect. However, that observation does not affect my decision.

accident, the sun was "hitting the area." [3] Pl. Ex. 7; Gov't Ex. 9.

7. At about 10 a.m. or 10:30 a.m., postal customer Joyce Belliveau arrived to get her mail. She did not walk the particular route taken later by the plaintiff Doreen Gray, and she did not look at that part of the sidewalk. Nevertheless, Belliveau testified that walkway conditions were icy and very slippery, that she slipped when she got out of her car, and that she did not observe salt or sand. She testified that she realized that she was walking on ice and proceeded very carefully as a result. According to weather records, the temperature then ranged between 14.8°F and 16.0°F. Pl. Ex. 20. Belliveau did not complain to Post Office personnel about the slippery walks that morning, nor did anyone else.

8. Joann Wood and her husband came to the Post Office about 11:30 a.m. Wood testified that the parking lot was icy. She said that she didn't look at the walkways in front of the main entrance because she was holding her husband's arm as they entered. But she did not consider the walkways unusually icy.

9. The plaintiff Doreen Gray arrived in her car at about 11:35 a.m. or 11:40 a.m.[4] The handicapped parking spaces were full, and she parked in the next space, adjacent to the public walkway that leads to both of the Post Office's entrances. Gray got out of her car and stepped up onto the curb en route to her Post Office box. Within a very few feet, she slipped backward, over the curb, and into the parking lot. She fell into the newly-vacated parking spot next to her car.[5] She testified that she slid on black ice covered by snow.

10. According to the weather reports, the temperature was 17.8°F at 11:03 a.m. and 20.5°F at 12:08 p.m. There are no intervening readings.

11. According to the report that Greene made after he helped load Gray into the ambulance (as a firefighter he heard the dispatch request for an ambulance and he responded as well), the "[a]rea was wet and partially snow covered with approximately 1/8″ of snow, other areas wet pavement. No ice present. Salt was around and under her, temps were approximately 15–18 degrees and rising, little wind, salt was working but slowly. Sun had been hitting the area." Pl. Ex. 7; Gov't Ex. 9. According to the accident reports that Amber Dearborn, the officer in charge of the Sebago Post Office, completed, she saw "icy conditions" and reported that Gray "stepped from parking lot up onto sidewalk with ice snow & salt on it." Pl. Ex. 8; Gov't Ex. 6. Dearborn also reported that the "sidewalk had been treated with salt due to snow melting & forming icy conditions." *Id.* In another document written on the day of the accident, Dearborn said that Gray "stepped up onto sidewalk which had ice treated with salt." Pl. Ex. 9; Gov't Ex. 4. In still another document, Dearborn wrote, "Sidewalk had salted ice and snow on it. . . . Sidewalk had ice & snow treated with salt on it." Gov't Ex. 5.

**3.** There was testimony about sun and shadow when photographs were taken *after* the accident, but it did not address when sun hit the Post Office sidewalks on the morning of January 2, 2009.

**4.** I say that because the ambulance report reveals that the ambulance was dispatched at 11:43 a.m. and arrived at the scene at 11:50 a.m. Pl. Ex. 39.

**5.** The parties have tried to re-create where she slipped, where she ended up, and the intervening mechanics, but the specifics cannot be determined, except where she ended up.

12. There is some conflict among the various observations. However, Dearborn's accident reports, the temperature charts, and the testimony of Belliveau and Gray persuade me that, notwithstanding Greene's earlier salt treatment, the sidewalk was still icy at the time of the accident, and I find that Gray slipped on the ice.[6] Although observers provided differing interpretations for the contemporaneous photos that Dearborn took, I find that they too are consistent with snow and ice being present on the sidewalk.

13. On the evidence presented at trial, I do not find that the other public entrance was closer or safer for Gray or that she should have observed that it was. Gray was appropriately following the Post Office's sidewalk to one of its public entrances. She was wearing proper footwear for the season.

14. An ambulance took Gray to the hospital in Portland. She was in great pain both while she lay on the ground at the Post Office and during the ambulance trip.

15. In the accident, Gray fractured her hip and hand. She underwent hip replacement surgery and received a cast for a fractured 5th metacarpal in her left hand. After her medical treatment at the hospital, she required extensive physical and occupational therapy through May 22, 2009. Pl. Ex. 40. *See also* Pl. Ex. 41. The parties stipulate that her medical expenses of $51,060.07 are reasonable, but the Postal Service disputes that it is responsible for these expenses. Pl. Ex. 32–B; Joint Stipulations at 1.

16. Years earlier, in 1991, Gray suffered a ruptured aneurysm. Her rehabilitation thereafter was good, but she was left with some memory loss, cognitive dysfunction, left-side weakness, and impairment in her left hand. She had trouble walking initially, but by the time of this accident, she walked mostly without a cane—except when she was going into large crowds. Gov't Ex. 11. She did not use a cane on her January 2, 2009 visit to the Post Office. No evidence was presented that use of a cane would have avoided her slip on the ice.

17. According to the testimony of the occupational therapist who worked with Gray after the accident, the functions of Gray's left hand and wrist have recovered to her baseline before the accident. (Gray already had some disability as a result of the aneurysm.)[7]

18. According to her physical therapist who dealt with therapy for the hip replacement, Gray was functioning well at the end of treatment. She was able to do yard work and not using her cane much. But she still was limping, which the therapist attributed more to Gray's strength than to her body's functional abilities. The therapist was unable to say whether the limp was a result of the aneurysm or of the accident.

19. As of the time of trial, Gray was using a cane more frequently than before the accident. As a result of her hip surgery, one of her legs is now one-quarter inch shorter than the other leg, a difference for which her orthopedist compensated with a shoe lift.

---

**6.** After returning to her vehicle—and as her husband prepared to back out of their parking space—Wood, a nurse, saw that Gray had fallen and came to her aid. Although Wood did not believe the conditions were "unusually" icy, she did observe ice.

**7.** The Postal Service objected to any testimony by the orthopedic surgeon about Gray's hand fracture and recovery as beyond the expert disclosure. I allowed the testimony *de bene,* but it does not affect my decision here.

20. The orthopedic surgeon testified that Gray has a permanent impairment amounting to 37% of her lower limb and 15% of her whole person.

21. The orthopedic surgeon also testified that, although Gray's surgery was successful, hip replacement surgery generally carries an increased risk of infection. Half of that risk occurs in the first year following surgery, a period now past. He testified that there is also risk of failure of the prosthesis and of fracture around it. Most of his patients are doing well 12 years after surgery. His prognosis for Gray is guarded and good.

22. In late 2010, Gray suffered some left leg and groin pain. However, the examining treatment provider attributed it to a degenerative disk condition not associated with the accident.

23. At the time of trial, Gray was 63 years old. She had previously stopped working as a result of her aneurysm.

### PROCEDURAL HISTORY

Gray sued the United States to recover damages caused by her accident.[8] After motion practice, two counts remain and both concern alleged negligence in how the

---

8. There is no defense of failure to exhaust administrative remedies.

9. Count I is captioned "Landowner/Occupier Liability"; Count II is captioned "Negligence." Both are premised on the defendant's asserted negligence. At trial, the parties did not differentiate between them, and neither do I. *See also Patterson v. United States*, 599 F.Supp.2d 34, 40 (D.Me.2009).

10. The treatise *Handling Federal Tort Claims* provides a useful listing of cases dealing with accidents on post office premises and caused by rain, snow, or ice:

Patrons of post offices are business invitees. Numerous claims arise from alleged breach of duties owed to them in that capacity. Many of these cases involve slip and fall injuries resulting from allegations that the

---

Postal Service maintained its Sebago Post Office sidewalk.[9] The Postal Service denies any negligence and says that Gray herself was negligent.

### CONCLUSIONS OF LAW

### *Jurisdiction and Applicable Law*

This federal court has jurisdiction under the Federal Tort Claims Act, 28 U.S.C. § 1346(b)(1). The Federal Tort Claims Act provides a limited waiver of sovereign immunity for tort claims like Gray's against federal agencies including the United States Postal Service:

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances.

*Id.* § 2674. As a result, Maine law applies. *Patterson v. United States*, 599 F.Supp.2d 34, 40 (D.Me.2009), citing *Clement v. United States*, 772 F.Supp. 20, 26 (D.Me. 1991).[10]

### *Negligence* [11]

Not surprisingly given Maine's climate, there is abundant caselaw concern-

---

Government has failed to remove rain, snow or ice from the premises. A number of cases have applied the rule that the landlord is not liable if the condition merely results from the natural accumulation of water, ice or snow; instead, there must be an unnatural accumulation or defect before the landlord can be found negligent. Other jurisdictions require landlord to use reasonable care to keep common areas safe from natural accumulations of snow and ice.

2 Lester Jayson and Robert Longstreth, *Handling Federal Tort Claims* § 9.10[4] at 9–286.1––9–287 (citations omitted) (2011). Despite this division in the country, ultimately Maine law controls my decision in this case.

11. The case has proceeded on the basis that the Postal Service as landowner owed a duty to its patrons to keep its premises reasonably safe.

ing Maine landowner obligations for snow and ice removal. In *Isaacson v. Husson College,* a case involving a college student's fall on an icy college sidewalk, the Law Court said that, although a person using a landowner's sidewalk must exercise ordinary care for her own safety, she is

> entitled to expect from the corporate defendant's employees the exercise of reasonable care in their activities affecting the condition of the campus ways and in their inspection of the same to discover their actual condition and any latent defects and, also, in taking such corrective measures or giving such warning as may be reasonably necessary for [her] protection.

297 A.2d 98, 103 (Me.1972) (citing *Restatement (Second) of Torts*). The same principle applies to a customer like Gray using the Postal Service sidewalks in Sebago, Maine. The Court made observations in *Isaacson* pertinent to this case:

> The process of thawing and freezing snow and ice is so palpably an integral part of our Maine winters that owners or occupiers of land know, or as reasonably prudent persons should know, that, in the very sequence of inevitable phenomena, spills on ice are readily foreseeable if no reasonable steps be taken to inspect the area ways under their control or otherwise protect their business invitees from harm.

*Id.* at 104.[12] In *Isaacson,* the Court distinguished the circumstance of ongoing storms and noted "[f]urthermore, the storm was over in the afternoon of the day before the accident" in support of upholding a verdict of liability against the landowner. *Id.* Likewise, in this case, any storm was well over by January 2, 2009, and what remained was *Isaacson's* "pro-cess of thawing and freezing snow and ice." *Id.*

In *Budzko v. One City Center Associates,* the Law Court addressed whether, given Maine winters, a landowner has any responsibility to business invitees *during* a storm and before it ends. 767 A.2d 310 (Me.2001). The Maine Law Court said "yes," that a landowner cannot wait until a storm ends to take safety precautions. As a result, it said that the following jury instruction may have been *too* favorable to a landowner: "A defendant is not required to remove snow or ice as it falls but is required to take appropriate corrective action to remove ice and snow within a reasonable time after the storm has abated." *Id.* at 315. A fortiori, as my findings of fact make clear, any storm in Sebago had "abated" by December 27, 2008, and there was plenty of time for the Postal Service "to take appropriate corrective action to remove ice and snow" before Gray fell on January 2, 2009. Yet the evidence (including the photographs) makes clear that, on January 2, 2009, the Postal Service still had not cleared its Sebago Post Office sidewalk. Given Maine's temperatures, which—as recognized in *Isaacson*—freeze and re-freeze melted snow or ice, it will not do to say that applications of salt alone during the days leading up to January 2 were sufficient. *Budzko* says that "[b]usiness owners have a duty to reasonably respond to foreseeable dangers and keep premises reasonably safe when significant numbers of invitees may be anticipated to enter or leave the premises during a winter storm." *Id.* They certainly have that obligation days after the storm has ended. In his *Maine Jury Instruction Manual,* Justice Alexander characterizes Maine law as articulated by *Budzko* and earlier cases

---

12. "The mere fact that snow and ice conditions are prevalent during the course of our severe Maine winters is not in and of itself sufficient rationale for the insulation of the possessor of land from liability to his business invitees." *Isaacson,* 297 A.2d at 103.

in the following jury instruction, stating that the plaintiff must prove:

1. There was an accumulation of snow and/or ice on the premises that was a proximate cause for her injuries;

2. The snow and/or ice condition had been present for a time of sufficient duration prior to plaintiff's injury to enable a reasonably prudent person to discover and remedy [or warn of] it; and

3. The defendant knew of the snow and/or ice condition and did not correct [or warn of] it, or did not know of the snow and/or ice condition but in the exercise of reasonable care should have known of and corrected [or warned of] the condition.

Douglas G. Alexander, *Maine Jury Instruction Manual* § 7–64 (4th ed. 2011). The plaintiff has satisfied her burden of proof here on all three elements. It was not reasonable care for the Postal Service's Dearborn to limit her examination of the walkways to one step (or two) out the door first thing in the morning and to rely on window examination thereafter. Reasonable and timely examination of the walkways would have revealed—after Greene's January 2 salting and before the accident—the icy conditions that Dearborn found *after* the accident and that Belliveau found earlier. It should have also produced a correction or a warning. In the Sebago, Maine context of melting and refreezing temperatures, relying entirely on Greene's salting activities—without any removal of the snow/ice/slush—was not enough.[13]

I conclude that it was negligent for Dearborn not to see the snow and ice on the sidewalks during the morning of Gray's accident and for her not to call for corrective action.[14] The absence of complaints (Maine folks pride themselves on their winter toughness) was not enough, nor were Dearborn's "window inspections." The Postal Service knew that elderly and handicapped people use its premises. When Gray fell, the condition of the sidewalk where she fell was unreasonably icy, and the Postal Service's negligence caused Gray's fall.

***Comparative Negligence***

 Under Maine law allowing a comparative negligence defense, 14 M.R.S.A. § 156, the burden of proof is on the defendant. *Crocker v. Coombs*, 328 A.2d 389, 392 (Me.1974). The Postal Service has not met that burden.

Mere knowledge of an icy condition before passing over it does not establish negligence on the part of a business invitee. The test is, whether the plaintiff, knowing of the icy condition, reasonably believed, or had a right to believe, that [she] could use the pathway safely by the exercise of reasonable care.

*Isaacson*, 297 A.2d at 106–07. Gray was wearing appropriate footwear for the conditions. In *Isaacson's* words, she had a right to believe that, by the exercise of reasonable care, she could safely use the Post Office sidewalk to access her Post Office box. The Postal Service has not persuaded me that it would have been safer for Gray to use the other public entrance. Neither has it persuaded me that Gray should reasonably have observed

---

**13.** I do not decide whether salt, sand, or a salt/sand mixture was the correct response or whether, if salt alone is used, the landowner needs to remove the ice and snow when it has melted, rather than allowing it to re-freeze.

**14.** I recognize that Greene treated the sidewalks after Dearborn's first early morning inspection, but it was incumbent on Dearborn to examine the surfaces thereafter, to observe that they were icy, and to seek correction.

that the route to the other entrance was safer.[15] Moreover, according to Maine law, if the Postal Service should have foreseen that a reasonable person would have proceeded on *this* route despite knowledge of its dangerousness, there is liability:

> [w]e held that a college student, to whom the college owed a duty of reasonable care, could not be precluded from recovering damages for injuries sustained in a fall on an icy sidewalk, despite his knowledge of the dangerous condition thereof, when the college should have foreseen that a reasonable person would have proceeded despite such knowledge.

*Poulin v. Colby College*, 402 A.2d 846, 851 (Me.1979), citing *Isaacson v. Husson College*, 297 A.2d 98 (Me.1972). On January 2, 2009, it had been several days since any storm. The Postal Service should have known that customers such as Gray would come to this public post office when it reopened after New Year's Day and would expect to be able to use both of its public entrances.[16] It has not met its burden to show comparative negligence.

I conclude that Gray is entitled to recover the entire amount of her damages caused by the Postal Service's negligence. That includes her medical expenses,[17] ($51,060.07, Pl. Ex. 32–B), together with an amount for her permanent impairment and her pain and suffering, for a total of $100,000.

### The Independent Contractor Exception/Delegation Defense

█ In closing argument, the government asserted that it cannot be liable for the negligence of an independent contractor such as Greene. The government did not present this argument in its trial brief, and counsel cited no cases. In any event, I am not holding the Postal Service liable for Greene's negligence. Instead, I am holding the Postal Service liable for its own negligence as a Maine landowner that failed to inspect and to call for additional treatment of its icy sidewalk on January 2, 2009. Moreover, although Greene was hired to do the physical labor of salting, the Postal Service's *Supervisor's Safety Handbook* makes clear that postal supervisors retain responsibility for customer safety. *See* Pl. Ex. 12. In its section titled "Removing Snow and Ice," the *Handbook* requires supervisors to "[p]rovide for re-inspection and cleaning as often as necessary to handle drifting snow and refreezing." *Id.* Dearborn herself testified that she was required to check periodically to make sure that the Post Office premises were safe for visitors. The inde-

---

**15.** Although Dearborn may have thought that Gray should not have ventured out at all because of her previous aneurysm or that Gray was required to use the slope for handicap access, I do not understand the Postal Service to make that argument. If it did, I would reject it. Gray had the same right as other citizens to access the Sebago Post Office.

**16.** "The duty of reasonable care does not fade if the danger is obvious, as long as the landowner can reasonably expect that the invitee will traverse the property regardless of the obvious danger." Jennifer Williams, *Budzko v. One City Center Associates Limited Partnership: Maine's Unique Approach to Business Owners' Duty to Remove Ice and Snow*, 55 Me. L. Rev. 517, 533 (2003).

**17.** I reject the Postal Service's efforts to subtract amounts for certain medications and supplies that the hospital provided to Gray while she was being treated. The Postal Service says that it should not pay for nicotine patches and blood pressure medication. But Gray could not smoke when she was in the hospital. Thus, the hospital provided the patch to manage her withdrawal. The hospital also had to provide medication to lower Gray's blood pressure so that the surgeon could safely operate. These are all expenses caused by the accident.

pendent contractor exception, therefore, is not applicable.

## CONCLUSION

The Clerk shall enter judgment for the plaintiff in the amount of One Hundred Thousand Dollars ($100,000), interest and costs.

**So Ordered.**